IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ILLINOIS

| | |
|---|---|
| KATHERINE H.,[1] | |
| Plaintiff, | |
| v. | Case No. 3:21-CV-00795-NJR |
| COMMISSIONER OF SOCIAL SECURITY, | |
| Defendant. | |

# MEMORANDUM AND ORDER

**ROSENSTENGEL, Chief Judge:**

In accordance with 42 U.S.C. § 405(g), Plaintiff seeks judicial review of the final agency decision denying her application for Disability Insurance Benefits (DIB) and Disabled Widow's Benefits (DWB) pursuant to 42 U.S.C. §§ 423, 402(e).

## BACKGROUND

On September 27, 2018, Plaintiff filed an initial claim for disability alleging a disability onset date of May 1, 2018. (Tr. 64).[2] These claims were denied initially on January 11, 2019, and again on reconsideration on April 29, 2019. (Tr. 89, 93). In response, Plaintiff requested a hearing before an Administrative Law Judge (ALJ) on May 13, 2019. (Tr. 103). The hearing was held on October 29, 2019. (Tr. 34). After holding a hearing, an ALJ denied the application on December 24, 2019. (Tr. 15-27). Plaintiff sought review from

---

[1] Plaintiff's full name will not be used in this Memorandum and Order due to privacy concerns. *See* Fed. R. Civ. P. 5.2(c) and the Advisory Committee Notes thereto.
[2] Plaintiff applied for DWB in June 2019. (Tr. 15, 199)

the Appeals Council. (Tr. 9). On May 17, 2021, the Appeals Council denied Plaintiff's request for review, making the ALJ's decision the final agency decision subject to judicial review. (Tr. 1). Accordingly, Plaintiff exhausted administrative remedies and filed a timely complaint.

## ISSUE RAISED BY PLAINTIFF

Plaintiff raises the following issue:

> The ALJ erred by not weighing all medical opinions. In doing so, the ALJ must consider supportability and consistency. The issue is whether substantial evidence supports the ALJ's analysis of Nurse Johnson's opinion.

(Doc. 23, p. 1).

## LEGAL STANDARD

For Plaintiff to qualify for DIB and DWB, she must be disabled within the meaning of the applicable statutes. Under the Social Security Act, a person is disabled if he or she has an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months." 42 U.S.C. § 423(d)(1)(a).

To determine whether a claimant is disabled, the ALJ considers the following five questions in order: (1) Is the claimant presently unemployed? (2) Does the claimant have a severe impairment? (3) Does the impairment meet or medically equal one of a list of specific impairments enumerated in the regulations? (4) Is the claimant unable to perform his or her former occupation? and (5) Is the claimant unable to perform any other work? *See* 20 C.F.R. § 404.1520.

An affirmative answer at either step 3 or step 5 leads to a finding that the claimant is disabled. A negative answer at any step, other than at step 3, precludes a finding of disability. The claimant bears the burden of proof at steps 1–4. Once the claimant shows an inability to perform past work, the burden then shifts to the Commissioner to show the claimant's ability to engage in other work existing in significant numbers in the national economy. *Zurawski v. Halter*, 245 F.3d 881, 886 (7th Cir. 2001).

It is important to recognize that the scope of judicial review is limited. "The findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive. . . ." 42 U.S.C. § 405(g). Accordingly, this Court is not tasked with determining whether or not Plaintiff was, in fact, disabled at the relevant time, but whether the ALJ's findings were supported by substantial evidence and whether any errors of law were made. *Lopez ex rel. Lopez v. Barnhart*, 336 F.3d 535, 539 (7th Cir. 2003). The Supreme Court defines substantial evidence as "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Biestek v. Berryhill*, 139 S. Ct. 1148, 1154 (2019) (internal citations omitted).

In reviewing for "substantial evidence," the entire administrative record is taken into consideration, but this Court does *not* reweigh evidence, resolve conflicts, decide questions of credibility, or substitute its own judgment for that of the ALJ. *Burmester v. Berryhill*, 920 F.3d 507, 510 (7th Cir. 2019). While judicial review is deferential, it is not abject; this Court does not act as a rubber stamp for the Commissioner. *See Parker v. Astrue*, 597 F.3d 920, 921 (7th Cir. 2010), and cases cited therein.

**EVIDENTIARY RECORD**

The Court has reviewed and considered the entire record in preparing this Memorandum and Order. The following summary of the record is directed to the points raised by Plaintiff.

### I. Evidentiary Hearing

Plaintiff was represented by an attorney at the hearing on October 29, 2019. (Tr. 37).

Plaintiff previously worked at Kroger for 27 years. (Tr. 42). She testified that she would "lose it" trying to get everything done at her job. (Tr. 43). This led to anxiety whenever she knew she had work coming up. (Tr. 47-51). She also suffers anxiety because of her relationship with her stepson. (Tr. 51). When she experiences anxiety, Plaintiff testified, she feels numb and paralyzed, and starts shaking. (Tr. 52). Plaintiff also testified that she had memory problems that were worsening: she would forget her medication, forget where she was and where she was going while driving, and forget the plot of movies and shows. (Tr. 53–54). She also testified that sometimes she wondered, "why am I here," and that sometimes, when she was around people, she needed to get away. (Tr. 55).

A vocational expert (VE) also testified. The ALJ asked her a hypothetical question which corresponded to the RFC assessment. (Tr. 57-58). The VE testified that there are approximately 600,000 medium hand packager positions nationally, approximately 190,000 laundry worker positions nationally, and approximately 100,000 medium linen room attendant positions nationally. (Tr. 58). The ALJ also asked the vocational expert

whether there are jobs in the national economy for someone "at the light exertional level, except that the individual could occasionally climb ramps and stairs; but never climb ladders, ropes, or scaffolding; is able to understand and remember simple instructions; can complete simple tasks; maintain attention and concentration for periods of at least two hours; can complete a normal workday and work week; can perform at a consistent pace for purposes of performing no more than simple tasks; able to relate appropriately to peers and supervisors in a work setting that requires no more than occasional interaction with the general public for purposes of performing simple work tasks; and can adapt to routine change in the workplace." (Tr. 59). The VE testified there are approximately 200,000 assembler production positions nationally, 600,000 packing line worker positions nationally, and 10,000 laundry related positions nationally. (Tr. 60).

### II.     Relevant Medical Records

In February 2018, Plaintiff began counseling services with Barbara Grear ("Grear"). (Tr. 544). In April 2018, Plaintiff had her annual exam with Emily Hanson, D.O. ("Dr. Hanson"). Dr. Hanson noted that Plaintiff was not nervous or anxious. (Tr. 335). Dr. Hanson also observed that Plaintiff had normal mood and affect. (*Id*.). A couple days after her annual exam, Plaintiff was seen by Beth Heaney, APN ("Heaney"); Plaintiff reported that her mood improved in recent months and benefited from starting therapy. (Tr. 533).

On June 1, 2018, Grear noted that Plaintiff was "doing okay." (Tr. 516). Plaintiff noted that "her employer is being very understanding; she will work 32 hrs. a week and have Friday—Sunday, off, each week[.]" (*Id*.). Later in June, Plaintiff noted that she

"decided to go on family medical leave and due to her own increased depression is having Beth Heaney, APN complete paperwork for temporary disability through work[.]" (Tr. 510). A week or so later, Plaintiff reported to Grear that she "is receiving temporary disability from work until the middle of September; reports she and her husband are taking things one day at a time and have grown even closer[.]" (Tr. 506). By the end of June, Plaintiff reported substantial improvements in mood. (Tr. 502).

On August 15, 2018, Plaintiff had a counseling appointment with Grear where the mental status exam showed Plaintiff had "problems with hygiene." (Tr. 461). Plaintiff's behavior included "lessened eye contact, low energy, [and] had little to talk about." (*Id.*). Plaintiff's speech was monotone and slow. (*Id.*). Plaintiff was "oriented to situation, time, place, and person." (*Id.*). Grear noted that Plaintiff's affect was flat, her insight and judgment were fair, and her thought processes were intact. (*Id.*). That same day, Dr. Hanson reported that Plaintiff was "[n]egative for agitation and confusion [and] [t]he patient is not nervous/anxious and is not hyperactive." (Tr. 570). Later in August 2018, Plaintiff had a counseling appointment with Grear, who noted that Plaintiff's progress had improved. (Tr. 457).

On September 11, 2018, Heaney observed that Plaintiff was cooperative, but she made "minimal eye contact." (Tr. 449). Plaintiff's speech was monotone, but she was "oriented to situation, time, place, and person." (*Id.*). Plaintiff was overwhelmed. Heaney noted that Plaintiff's affect was flat and constricted, but her insight, judgment, and thought processes were intact. (Tr. 449-450). Heaney also recorded that Plaintiff's progress was worse. (Tr. 450).

Later, in September 2018, Heaney observed that Plaintiff was cooperative, clear, and "oriented to situation, time, place, and person; normal attention and concentrating ability; and memory intact." (Tr. 445). Plaintiff's mood was described as "worried." (*Id.*). Heaney noted that Plaintiff's affect was congruent to thought content and her insight, judgment, and thought processes were intact. (*Id.*). Plaintiff's appointments with Heaney, Grear, and Dr. Hanson in October 2018 show that Plaintiff's progress remained unchanged. (Tr. 343, 434, 438).

By November 2018, Plaintiff was seen Kati Rush, DPM ("Dr. Rush"). (Tr. 355). Dr. Rush noted that Plaintiff was "scheduled to go back to work and she is concerned about that as she needs to be on her feet for work." (*Id.*). Plaintiff did not mention anxiety or depression regarding going back to work.

In December 2018, Plaintiff had a counseling appointment with Grear. The mental status exam showed Plaintiff was cooperative, clear, "oriented to situation, time, place, and person and memory intact." (Tr. 419). Plaintiff's mood was sad and fearful. (*Id.*). Grear noted that Plaintiff's affect was congruent to thought content, and her insight, judgment, and thought processes were intact. (*Id.*). Grear also noted, however, that Plaintiff's progress worsened. (*Id.*).

On December 18, 2018, Dollean York Anderson, Ph.D. ("York Anderson") did a mental status evaluation. (Tr. 371). York Anderson noted that Plaintiff had "fair social skills." (Tr. 372). York Anderson noted that Plaintiff's mood appeared depressed, and "[h]er speech was clear, coherent, logical, goal-directed and relevant." (*Id.*). York Anderson noted that "[s]he was cooperative in attitude toward this examiner and rapport

was easily established with her." (*Id.*). At this examination, Plaintiff denied current suicidal and homicidal ideation. (*Id.*). "No psychotic symptoms were observed." (*Id.*). York Anderson also noted that Plaintiff's "thought processes were logical, relevant and coherent." (Tr. 373).

On December 19, 2018, Plaintiff had a counseling appointment with Grear, who recorded that Plaintiff's progress was worse. (Tr. 415). But a mental status exam showed Plaintiff was cooperative, clear, "oriented to situation, time, place, and person and memory intact and normal attention." (*Id.*). Grear noted that Plaintiff's affect was congruent to thought content and her insight, judgment, and thought processes were intact. (*Id.*).

On January 23, 2019, Plaintiff went to Nurse Johnson for medication follow-up. (Tr. 402). "[Plaintiff] states that she is having problems with her depression on some day[s]." (*Id.*). Plaintiff's stress level was medium. (Tr. 403). The mental status exam showed Plaintiff was cooperative, clear, "oriented to situation, time, place, and person; normal attention and concentrating ability; and alert and memory intact." (Tr. 404). Nurse Johnson noted that Plaintiff's mood was "sad; situation-family stressor." (*Id.*). Plaintiff's insight, judgment, and thought processes were intact. (*Id.*). Plaintiff reported benefits with current medications. (*Id.*). However, on that same day, Plaintiff had a counseling appointment, and Grear reported that Plaintiff's progress had not changed. (Tr. 407).

In February 2019, Grear's mental status exam showed Plaintiff was cooperative, clear, "oriented to situation, time, place, and person; normal attention and concentrating ability; and memory intact." (Tr. 400). Plaintiff's mood was appropriate. (*Id.*). Grear noted

that Plaintiff's affect was congruent to thought content and her insight, judgment, and thought processes were intact. (*Id.*). While Plaintiff reported that "she feels like a weight has been lifted off her shoulders" (Tr. 401), Grear reported that Plaintiff's progress had not changed. (Tr. 400).

On March 5, 2019, Plaintiff went to a counseling appointment with Grear. (Tr. 389). The mental status exam showed Plaintiff was cooperative, clear, "oriented to situation, time, place, and person; normal attention and concentrating ability; and memory intact." (Tr. 392). Plaintiff's mood was concerned and motivated. (*Id.*). Grear noted that Plaintiff's affect was congruent to thought content and her insight, judgment, and thought processes were intact. (*Id.*). Grear reported that Plaintiff's progress was stable. (*Id.*).

On March 12, 2019, Nurse Johnson noted that Plaintiff was cooperative, clear, "oriented to situation, time, place, and person; normal attention and concentrating ability; and alert and memory intact." (Tr. 388). Plaintiff's mood was sad. (*Id.*). Nurse Johnson noted that Plaintiff's affect was congruent to thought content and her insight, judgment, and thought processes were intact. (*Id.*). Plaintiff reported benefits with current medications. (Tr. 389).

On March 13, 2019, Nurse Johnson wrote the following letter:

> [Plaintiff] was diagnosed with recurrent major depressive disorder, post-traumatic stress disorder and Generalized Anxiety Disorder dated back to 2017.
>
> Currently, she involved with an intensive outpatient mental health team that provides treatment as well as case management services. She continues to meet with her therapist. With this intensive support, [Plaintiff] has been able to remain out of the hospital. She is easily stressed, becomes anxious and often experiences recurrence of symptoms which affect her daily

> activities.
>
> She worries a great deal about managing her illness and getting back to "normal." In addition, she feels stressed in her marital relationship due to her spouse's terminal illness and worries about the finances.
>
> [Plaintiff's] illness has been severe and disabling and she is unable to work.

(Tr. 375).

Days later, on March 19, 2019, Nurse Johnson noted that Plaintiff was cooperative, clear, "oriented to situation, time, place, and person; normal attention and concentrating ability; and memory intact." (Tr. 382). Plaintiff's mood was appropriate. (*Id.*). Plaintiff's affect was congruent to thought content and her insight, judgment, and thought processes were intact. (*Id.*). Plaintiff also reported that her current medications were beneficial. (*Id.*). In April 2019, Nurse Johnson noted that Plaintiff "[r]eports ongoing benefits with current medications." (Tr. 703).

Grear noted that Plaintiff spoke slowly on April 25, May 2, and May 9, 2019. (Tr. 693–97, 688–92, 681–85). On July 12, 2019, Grear reported how Plaintiff "decided to apply for a part-time position in the cafeteria at Carbondale Hospital and will also be helping an elderly lady a couple hours a day Monday through Friday[.]" (Tr. 656). Grear observed that Plaintiff's progress was stable. (*Id.*).

In August 2019, Nurse Johnson noted that Plaintiff was cooperative, clear, "oriented to situation, time, place, and person; normal attention and concentrating ability; and memory intact." (Tr. 630). Plaintiff's mood "a little down actively grieving." (*Id.*). Nurse Johnson noted that Plaintiff's affect was pleasant and congruent to thought content and her insight, judgment, and thought processes were intact. (*Id.*). Plaintiff also

reported that she was tolerating medications with benefits. (*Id.*).

In October 2019, Nurse Johnson submitted a fill in the blank "medical source statement." (Tr. 812). She indicated that Plaintiff's medications made her drowsy, that she would be unable to work three days a month, and that she would be off task twenty-five percent of the time. (*Id.*). In addition, on the form, Nurse Johnson indicated that Plaintiff was markedly limited in the following activities:

- performing activities within a schedule, maintaining regular attendance, and being punctual within customary tolerances;

- completing a normal workday and workweek without interruption from psychologically based symptoms and performing at a consistent pace without an unreasonable number and length of rest periods;

- accepting instructions and responding appropriately to criticism from supervisors; and

- traveling in unfamiliar places or using public transportation.

(Tr. 813).

### III. State Agency Consultant's Opinions

In January 2019, Howard Tin, Psy.D. ("Tin") and Lenore Gonzalez, M.D. ("Dr. Gonzalez") assessed Plaintiff's RFC based on a review of the record. Dr. Gonzalez concluded that Plaintiff could do medium work. (Tr. 67-71). Tin indicated that Plaintiff had mild difficulties understanding, remembering, or applying information. (Tr. 67). Tin further indicated that Plaintiff had mild difficulties interacting with others. (*Id.*). Ultimately, Tin found that "[Plaintiff's] allegation of the severity of the disorder is not consistent with claimant's ability to function generally well from day to day." (*Id.*).

In April 2019, Celine Payne-Gair, PhD ("Payne-Gair") generally agreed with Tin's

opinion. (Tr. 74-89). Payne-Gair indicated that Plaintiff was moderately limited in her ability to maintain attention and concentration for extended periods. (Tr. 85). Payne-Gair further indicated that Plaintiff was moderately limited in her ability to interact with others. (Tr. 86). Payne-Gair wrote in part, "[Plaintiff] can complete simple and detailed tasks, maintain attention and concentration for periods of at least two hours, complete a normal workday and workweek [with] [out] significant psychologically related interruptions, and perform at a consistent pace." (*Id*.).

## DECISION OF THE ALJ

The ALJ followed the five-step process to determine if Plaintiff is disabled. (Tr. 16). The ALJ determined that Plaintiff has not engaged in substantial gainful activity since May 1, 2018, the alleged onset date. (Tr. 18). The ALJ found that Plaintiff suffered from the following severe impairments: posterior tibial tendon dysfunction of both lower extremities, osteoarthritis, obesity, major depressive disorder (MDD), posttraumatic stress disorder (PTSD), anxiety, and insomnia. (*Id*.).

The ALJ found that Plaintiff has the RFC to perform medium work. (Tr. 20). The ALJ also found that Plaintiff is unable to perform any past relevant work. (Tr. 26). Based on the testimony of the vocational expert, the ALJ found that considering Plaintiff's age, education, work experience, and RFC, she is capable of making a successful adjustment to other work that exists in significant numbers in the national economy. (*Id*.).

## DISCUSSION

I. **ALJ's Rejection of Nurse Johnson's Opinion**

Plaintiff argues the ALJ "rel[ied] on a non-examining State agency opinion over

the statements of [Plaintiff's] treatment team." (Doc. 23, pp. 9-10). According to Plaintiff, "[a] remand is necessary because the ALJ erred by not providing a legitimate reason, rooted in the record, to disagree with Nurse Johnson's assessment of [Plaintiff's] limitations." (*Id.*).

For claims filed on or after March 27, 2017,[3] the ALJ is required to evaluate the medical opinion evidence under 20 C.F.R. § 404.1520c. Under this regulation, the ALJ "will not defer or give any specific evidentiary weight, including controlling weight, to any medical opinion(s) or prior administrative medical finding(s), including those from [a claimant's] medical sources." *Id*. An ALJ is required to articulate "how persuasive [she] find[s] all of the medical opinions and all of the prior administrative medical findings in [a claimant's] case record." *Id*. When evaluating medical opinions, 20 C.F.R. § 404.1520c lists out factors for ALJ's to consider including: supportability, consistency, relationship with the claimant, specialization, and other factors that tend to support or contradict a medical opinion or prior administrative medical finding. *Id*. "An ALJ's decision must explain how she considered the factors of *supportability* and *consistency*, but she is not required to explain how she evaluated the other factors." *Josefina T. v. Kijakazi*, 2022 WL 2669523, at *3 (N.D. Ill. July 11, 2022) (citing 20 C.F.R. § 404.1520c(b)(2)) (emphasis added).

  A. *ALJ Mischaracterized the Record Claiming Nurse Johnson Failed to Support Her Opinion*

Plaintiff argues that "the ALJ mischaracterized the record when claiming Nurse Johnson did not support her opinion." (Doc. 23, p. 11). According to Plaintiff, "Nurse

---

[3] Plaintiff filed her claim in 2018. (Tr. 64).

Johnson provided support for her opinion in the form of medical treatment notes." (*Id*. at p. 12). Plaintiff summarizes that "[t]he ALJ found Nurse Johnson's opinion unpersuasive based, in part, on an incorrect assumption that she did not provide support for her opinion." (*Id*. at pp. 12-13).

The Court concludes that the ALJ engaged sufficiently with the evidence and followed 20 C.F.R. § 404.1520c. The ALJ did not find that Nurse Johnson's opinion in the March 13, 2019 letter to be unpersuasive because she failed to provide support for her opinion. Instead, the ALJ noted the following:

> The undersigned does not find this medical opinion persuasive, as it is not consistent with *nor supported by the evidence of record showing mostly mild examination findings*. PMHNP-BC also does not give a function-by-function assessment of the claimant's abilities.

(Tr. 25) (emphasis added). The ALJ's conclusions are supported by record.

The ALJ also did not find that Nurse Johnson's opinion in the October 18, 2019 mental medical source statement to be unpersuasive because she failed to provide support for her opinion. Instead, the ALJ noted the following:

> The undersigned does not find this opinion persuasive, as it is not consistent with *nor supported by the evidence of record showing mild mental status examination findings, discussed above*. PMHNP-BC Johnson also does not explain her reasoning for why she deviated from the mild examination findings from Shawnee Health Service.

(Tr. 25-26) (emphasis added). The ALJ did not find that Nurse Johnson did not support her opinion, but acknowledged the difference between Nurse Johnson's opinion and other findings from Shawnee Health Service. Accordingly, the Court rejects this argument.

B. *ALJ Asserting that the Record Showed Mild Mental Status Examination Findings*

Next, Plaintiff argues that "the ALJ's reliance on mild objective findings is insufficient." (Doc. 23, p. 13). Plaintiff asserts that "the ALJ did not explain what he meant by 'the evidence of record showing mild mental status examination findings.'" (*Id.*). Then Plaintiff spills a considerable amount of ink picking out favorable portions of the record to argue that Plaintiff suffered more than mild symptoms. (*Id.* at pp. 13-15). Plaintiff concludes by noting that "the clinical record contains observations from various medical treatment providers of more than mild symptoms." (*Id.* at p. 14). This argument is merely asking the Court to reweigh the evidence.

After analyzing the record, the ALJ sufficiently explained what he meant by mild mental status examination findings, noting the following:

> The record regarding her psychological health shows that the claimant has long-standing mental health impairments that predate her stopping working. (*See also* Exs. 5F 153-169, 8F 162-171) She received mental health treatment with Shawnee Health Service, and followed up on May 1, 2018. (Ex. 5F 151-153) She was prescribed Abilify. It was noted that she has had problems with depression for the past 20 years or more. Her mental status examination was within normal limits. Her diagnoses included chronic PTSD, anxiety, and moderate recurrent major depression. She continued treatment, and continued to have mostly normal to mild mental status examination findings. (Ex. 5F) She was noted to be sad, tearful, and hopeful on May 21, 2018 (Ex. 5F 147), but her mental status examination was otherwise within normal limits. Her mood and affect were anxious and sad/tearful on June 6, 2018, on June 11, 2018, and on July 3, 2018 (Ex. 5F 119, 135, 138), but her mental status examinations were again otherwise within normal limits. She was noted to have an apathetic mood, and a flat affect on August 15, 2018, and on September 11, 2018. (Ex. 5F 74, 86) She also was noted to be overweight, had lessened eye contact, low energy, and had little to talk about. On October 5, 2018, her BMI was 40.8, and her mental status examination noted a sad and anxious affect and mood. She had occasional, passive suicidal ideation with no intent or plan. (Ex. 5F 65-68) Her diagnoses included recurrent major depressive episodes, moderate. *She*

> *continued to have mild findings, and followed up on January 23, 2019.* (Ex. 5F 27-29) She said that her spouse has stage 4 cancer, and does not have a long time to live. Her BMI was 41.7. Her mood was sad due to situational family stressors, and her affect was sad and tearful. Her examination was otherwise within normal limits. At a follow up on February 11, 2019 (Ex. 5F 23-27), she had quit her job at Kroger, and felt like a weight had been lifted off her shoulders. She was to attend her niece's wedding, and she had talked about her new puppy, Zeus. Her mental status examination was mostly within normal limits. This evidence supports finding that the claimant can perform work activity within the restrictions of the above residual functional capacity assessment.

(Tr. 23-24) (emphasis added).

The ALJ did not simply discredit "Nurse Johnson's opinion based on a mischaracterization of the severity of [Plaintiff's] clinical findings[.]" (Doc. 23, p. 15). Rather, the ALJ engaged sufficiently with the evidence.[4]

## Conclusion

After careful review of the record as a whole, the Court finds that the ALJ committed no errors of law, and his findings are supported by substantial evidence. Accordingly, the final decision of the Commissioner of Social Security denying Plaintiff's application for disability benefits is **AFFIRMED**, and this action is **DISMISSED with prejudice**.

---

[4] Plaintiff also notes that the analysis in "*Larson v. Astrue*, 615 F.3d 744 (7th Cir. 2010) is helpful in this claim." (Doc. 23, p. 15). According to Plaintiff, "[t]he record in this claim is more compelling [than] [*Larson*] because this claim contains more frequent therapy, letters from [Plaintiff's] medication nurse and therapist supporting the disability claim, and multiple abnormal mental status examination findings." (*Id.*). The Court disagrees. As Defendant notes: "Nurse Johnson saw Plaintiff only six times over one year and adjusted medications only twice and the other evidence in the record did not support her pessimistic assessment (Tr. 381, 386, 402, 628, 643, 685)." (Doc. 27, p. 12).

The Clerk of Court is **DIRECTED** to enter judgment accordingly and close this case.

**IT IS SO ORDERED.**

**DATED:  March 17, 2023**

**NANCY J. ROSENSTENGEL**
**Chief U.S. District Judge**